**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| TROY P. CRUMBLEY, | : | |
| | : | |
| Plaintiff, | : | Case No.: 1:08-CV-65 (WLS) |
| | : | |
| v. | : | |
| | : | |
| WARDEN KEVIN ROBERTS, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 58.)  For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED-IN-PART AND DENIED-IN-PART.**

## FACTUAL SUMMARY

### I.  Introduction

The following summary of relevant facts contains the undisputed facts derived from the Complaint (Doc. 1), Defendants' Answer (Doc. 16), Defendants' November 23, 2009 Statement of Undisputed Facts (Doc. 20-1), former plaintiff Peter A. Bugge's January 26, 2010 Response to Defendants' Statement of Undisputed Facts[1] (Doc. 25-12), Defendants' instant Statement of Undisputed Facts (Doc. 58-56), and Plaintiff's Response to Defendants' Statement of Undisputed Facts (Doc. 66), all of which were

---

[1] Defendants' November 23, 2009 Statement of Undisputed Facts and former plaintiff Peter A. Bugge's January 26, 2010 Response to Defendants' Statement of Undisputed Facts were in relation to a motion for summary judgment as to Bugge, executor of the estate of John C. Bradford, the father of John W. Bradford, an inmate who died due to the alleged constitutional violations by Defendants in the above-captioned matter.  Plaintiff Bugge's pleadings are relevant to the instant dispute because Mr. Bradford allegedly sustained injuries under facts similar to those alleged by Troy P. Crumbley.  For these reasons, some facts are extrapolated from pleadings that do not directly relate to Crumbley.

submitted pursuant to Local Rule 56.[2]   Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to Plaintiff as the nonmoving party.  FED. R. CIV. PRO. 56; *Celotex Corp v. Catrett*, 477 U.S. 317, 322-23 (1986).

## II. Relevant Facts

In July 2006, John W. Bradford ("Bradford") and Troy P. Crumbley ("Plaintiff") were being housed at Calhoun State Prison ("CSP"), which is located within the Middle District of Georgia.  (Doc. 1 at ¶¶ 1-2.)  Bradford was assigned to cell 136 in Dorm J-2.  (Doc. 25-12 at ¶ 1.)  Plaintiff was assigned to bunk 53B in Dorm D-4.  (Doc. 66 at ¶ 2.)  However, Defendants did not consistently enforce bunk assignments.  (*Id.*; Doc. 58-2 at 2 lns. 6-13.)

---

[2] Local Rule 56 states:

> The movant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure shall attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact shall be numbered separately and shall be supported by specific citation to the record. Material facts not supported by specific citation to the record and statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court. Affidavits and the introductory portions of briefs do not constitute a statement of material facts.

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise inappropriate. The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Rule 56(f) of the Federal Rules of Civil Procedure.

> All documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment shall be clearly identified for the court. Where possible, dates, specific page numbers, and line numbers shall be given.

M.D. GA. LOCAL R. 56.

On July 5, 2006, following an altercation between Bradford and another inmate, Bradford was beaten by several inmates in his assigned cell at CSP and died from his injuries. (Doc. 25-12 at ¶¶ 22-23.) Inmate Carlos Fanning pleaded guilty to voluntary manslaughter for Bradford's death. (*Id.* at ¶ 64.) Bradford did not ask to be placed in protective custody prior to the fatal beating, but the parties disputed whether officers were alerted that "there was about to be trouble" if Bradford and the other inmate were not separated. (*Id.* at ¶ 15; *see* Doc. 25-2 at 2; *see also* Doc. 31 at 4 n.4.)

On July 6, 2006, the day after Bradford's death, a shakedown was conducted at CSP by the Department of Corrections' statewide tactical squad. (Doc. 66 at ¶ 52.) The shakedown resulted in the confiscation of 23 weapons. (*Id.* at ¶ 54; Doc. 58-34 at 3.) CSP was on "lockdown" from July 6 through July 12, 2006. (Doc. 66 at ¶ 55.) During that time, the Office of Investigations and Compliance conducted interviews at CSP. (*Id.* at ¶ 61.) Warden Roberts did not conduct or oversee the investigations. (*Id.* at ¶ 62.)

On July 7, 2012, Plaintiff was questioned about Bradford's murder and the conditions of the prison after informing an investigating officer "you've got problems at this compound." (Doc. 58-3 at 17 lns. 10-25.) Plaintiff "asked [investigators John Moore and Bruce Oliver] to be locked down" at this time.[3] (*Id.* at 15 lns. 17-20; Doc. 58-4 at 4 lns. 15-17.) On July 12, 2006, around 4:00 p.m., while Plaintiff was at the medical facility in the prison, an officer announced that investigators wanted to speak with him for a second time. (Doc. 58-4 at 8 lns. 2-11.) Once Plaintiff met with the officer, the officer told Plaintiff that he was wanted for questioning a second time and he therefore "must be telling them something good." (*Id.*) The purpose of the second interview was

---

[3] Plaintiff maintains that he did not ask specifically to be placed in protective custody, but instead asked to be "locked down" and alleges that the investigators know that the two requests are synonymous. (Doc. 58-4 at 4 lns. 14-20.)

to investigate an alleged income tax fraud scheme that was being perpetrated by inmates at CSP.  (Doc. 58-1 at 28 lns. 14-20.)   During the second interview, he again asked investigators to remove him from his dormitory.  (Doc. 58-4 at 9 lns. 10-15.)

During the evening of July 12, 2006, after the second interview, John Moore and another investigator told all inmates to "get in the right bunks."  (*Id.* at 10 lns. 4-8.) Plaintiff was concerned because inmates were required to return to their assigned bunks to sleep that night, and his assigned bunk was in a dimly lit area in the back of the dormitory.  (*Id.* at 10 lns. 16-24.)  Also, Plaintiff was concerned about remaining in his dormitory because the announcement made by the officer escorting him to the second interview caused "the whole dormitory [to know Plaintiff was going] to counseling" to speak with investigators.  (Doc. 58-3 at 19 lns. 8-25.)

At approximately 7:30 p.m., Plaintiff learned that an inmate had broken into his locker.  (Doc. 58-1 at 30 lns. 10-18.)  Believing he now had a "legitimate reason" to speak with prison officials in light of his concerns about being suspected of providing information about other inmates' criminal conduct, Plaintiff approached Defendant Battle.  (Doc. 58-4 at 11 lns. 2-13.)  Plaintiff is "sure [he] told [Defendant Battle] she needed to move [Plaintiff to a different dorm]."  (*Id.* at 11 lns. 11-13.)  However, he was not transferred to another dorm.  (*See* Doc. 58-27 at 2.)  In addition, although Plaintiff cannot remember the exact content of the information he relayed to prison officials, he remembers complaining about his placement in the back of the dormitory to sleep, the general dangerousness of the prison, and his exposure to other inmates.  (Doc. 58-2 at 1 lns. 16-21, 2 lns. 19-23, 5 lns. 3-4.)  After the shift change at 10:00 p.m., prison officials conducted a "surprise" shakedown of Plaintiff's dormitory.  (Doc. 58-1 at 32 lns. 10-14.)

4

The lights were turned off and Plaintiff was attacked by several inmates shortly before midnight. (*Id.* at 12 lns. 7-9.)

Defendant Roberts, who was Warden of CSP from December 16, 2004 through June 30, 2006, was not present at CSP on July 5, 2006. (Docs. 20-3 ¶ 7; 25-13 at ¶¶ 24, 25; 66 at ¶ 1.) Defendant Thompson became Warden of CSP on July 1, 2006, but was not present at the prison until July 5, 2006. (Docs. 20-13 at ¶ 8; 25-13. at ¶¶ 27, 28; 66 at ¶ 5.) The following Defendants held the following positions at CSP at all times relevant to this suit: Defendant Christine Cross was Deputy Warden of Care and Treatment (Docs. 25-12 at ¶ 30; 66 at ¶ 8), Defendant Jerry Jefferson was Deputy Warden of Security (Docs. 20-3 at ¶ 32; 66 at ¶ 11), Defendants Eula Battle and Eddie Smith were Sergeants (Docs. 20-3 at ¶ 40; 66 at ¶¶ 14, 23), and Defendants Anthony Cox, DeWayne Booker, Derrick McDaniel, William McGinnis, and Horace Gilbert were Correctional Officers II. (Docs. 20-3 at ¶¶ 37, 44, 50, 54, 57; 66 at ¶¶ 18, 27, 30, 34, 37.)

Plaintiff does not recall seeing Defendants Cross or Jefferson on July 12, 2006, and did not tell either of them that he believed he was in danger on that day. (Doc. 66 at ¶¶ 9, 12.) Defendant Battle worked from 1:45 p.m. until 10:00 p.m. on July 12, 2006. (*Id.* at ¶ 15.) Defendant Cox worked from 1:45 p.m. until 10:00 p.m. on July 12, 2006 in CSP's medical unit. (*Id.* at ¶¶ 19, 20.) Plaintiff has no recollection of seeing Defendant Cox on July 12, 2006. (*Id.* at ¶ 21.) Defendant Smith worked 9:45 p.m. on July 12, 2006 until 6:00 a.m. on July 13, 2006, and was assigned to central control # 2 as an assistant supervisor. (*Id.* at ¶¶ 24, 40, 41.) Plaintiff has no recollection of seeing Defendant Smith on those dates. (*Id.* at ¶ 25.) Defendants Booker and McDaniel were not present at CSP on July 12, 2006. (*Id.* at ¶¶ 28, 32.) Defendants McGinnis and Gilbert worked from 9:45 p.m. on July 12, 2006 until 6:00 a.m. on July 13, 2006. (*Id.* at ¶¶ 35, 38.)

Inmate McMillian, a white male, arrived at CSP on November 9, 2005, and was initially assigned to Dorm J-2.  (Doc. 25-1 at ¶¶ 1, 10.)  McMillian described Dorm J as the intake dormitory; Dorm D as an "open dormitory," containing D-1 for "mobile construction," D-2, D-3 for "older inmates," and D-4, which was "known as the roughest dormitory"; Dorm E as containing "two man cells"; and Dorm F, which contained Dorm F-2, a "faith based dormitory and safest housing unit on the compound."  (*Id.* at ¶¶ 1, 6, 11, 12.)  When McMillian first arrived at CSP, a black inmate offered him a shank and explained that white inmates needed weapons for protection.  (*Id.* at ¶ 10.)  McMillian was housed in Dorm J-2 for two and one-half months, and left on January 22, 2006.  (*Id.* at ¶¶ 2, 4, 6.)  He heard that armed robberies and locker break-ins occurred, but never witnessed them.  (*Id.* at ¶ 2, 3, 11.)

Inmate Mobley, a white male, was housed in Dorm J-2 at CSP beginning in November 2005.  (Doc. 25-5 at ¶¶ 1, 2.)  Items were stolen from Mobley's locker in December 2005 and January 2006.  (*Id.* at ¶¶ 5, 6.)  Mobley heard of other white inmates experiencing locker break-ins, and older white inmates being victims of "snatch robberies" while walking from the store to their cells.  (*Id.* at ¶ 6.)  He regularly observed his cellmate with cocaine and marijuana.  (*Id.* at ¶ 8.)  Mobley feared for his life during his tenure in Dorm J-2.  (*Id.*)  Mobley claims that he wrote Defendants Roberts and Cross, among others, but he was ignored.  (*Id.*)

Inmate Moss, a white male, was housed at CSP for approximately two years, beginning in 2004.  (Doc. 25-6 at ¶ 3.)  While at CSP, Moss was housed in Dorm H-1 for about six months and Dorm D-3 for about 18 months.  (*Id.* at ¶ 3.)  Moss observed gang problems in Building D and believed that the "guards had no control over the inmates."  (*Id.* at ¶ 5.)  He explained that the "Gangsta Disciples" was a gang that operated "in

every dormitory but mostly D-4 ... and they controlled the drug trade, were extremely violent running in large packs stealing, robbing and committing acts of violence against the whites and receiving little punishment when caught."  (*Id.* at ¶ 9.)  Moss accused Officers Booker and McDaniel as being "tied into the gangs" and explained his belief that Officer Booker was involved in enabling an inmate to be "ganged out by the [Gangsta Disciples.]"  (*Id.* at ¶¶ 11-12.)  Moss read a letter that Plaintiff drafted to send to the commissioner regarding the conditions of the prison, and wrote a similar letter to Defendant Roberts.  (*Id.* at ¶ 15.)  Moss observed Plaintiff as one of the few inmates in Dorm J-2 to be "called out ... to be interviewed," had knowledge that Plaintiff was afraid that the Gangsta Disciples believed that he "ratted them out," and attempted to deliver a weapon to Plaintiff for protection shortly before Plaintiff's attack.  (*Id.* at ¶¶ 20-23.)

## PROCEDURAL HISTORY

Peter A. Bugge ("Bugge"), executor of the estate of John C. Bradford, Bradford's father, and Plaintiff, brought suit under 42 U.S.C. § 1983, alleging that prison officials were deliberately indifferent to the dangers of CSP in violation of the Eighth Amendment to the United States Constitution.  (Doc. 1 at ¶¶ 4, 10.)  Specifically, Plaintiff and Bugge alleged that Defendants were deliberately indifferent to the violent gangs that were openly operating at CSP, took inadequate security measures, scheduled security guards in a manner that caused understaffing, and otherwise allowed the operation of a dangerous prison in a way that culminated in Bradford's death and Plaintiff's injuries. (*Id.* at ¶¶ 10-11.)  The Complaint named former Warden Kevin Roberts, current Warden Dannie Thompson, Deputy Wardens Christine Cross and Jerry Jefferson, Sergeants Anthony Cox and Eddie Smith, Lieutenant Eula Battle, and Officers William McGinnis, Derrick McDaniel, and Horace Gilbert.  (*Id.* at ¶ 3.)

On March 30, 2009, this Court granted Defendants' Motion to Dismiss as to Plaintiff for failure to exhaust administrative remedies.  (Doc 15 at 3.)  The Court denied Defendants' Motion to Dismiss as to Bugge.  (*Id.* at 10.)  On September 24, 2010, the Court granted Defendants' Motion for Summary Judgment as to Bugge, finding that "none of the Defendants had sufficient knowledge of [a substantial risk of serious harm to Bradford and therefore Bugge] failed to establish a necessary causal link between any of the Defendants and the attack on Bradford."  (Doc. 31 at 23.)

The Eleventh Circuit reversed this Court's Order on May 18, 2011.  *See Bugge v. Roberts*, 430 F. App'x 753 (11th Cir. 2011).  The Eleventh Circuit found that Plaintiff had exhausted administrative remedies because officials at CSP improperly denied his formal grievance.  *Id.* at 756.  Also, the Eleventh Circuit held that Bugge's evidence was sufficient to survive summary judgment based on the claim that Defendants were "deliberately indifferent to a substantial risk of harm posed to Bradford due to dangerous prison conditions at CSP, and that defendants' deliberate indifference to those conditions caused the attack that resulted in Bradford's death."  *Id.* at 759.  Among the evidence that the Eleventh Circuit found persuasive was evidence suggesting:

> numerous racially charged robberies occurred at CSP, particularly of store-bought goods; there were "hundreds" of weapons in the prison, and almost every inmate in Bradford's dormitory owned or had access to a shank; prison officials refused to discipline inmates for possessing weapons; and gangs, which operated in every dormitory, were extremely violent, stealing, robbing, and committing acts of violence against white inmates in particular.  There is also evidence that officials encouraged inmates to obtain weapons for protection, due to the dangerous conditions at CSP...  Viewing this evidence in the light most favorable to Bugge, genuine issues of material fact remain as to whether a substantial risk of serious harm existed at CSP.

*Bugge*, 430 F. App'x at 759.

8

However, the Eleventh Circuit held that all Defendants were entitled to summary judgment except for Warden Roberts because there was evidence that he was aware of the dangerous conditions at CSP, and evidence suggested that he was the only Defendant with "the power to take reasonable steps to address them." *Id.* at 760.  The Court noted that "Warden Roberts left his post at CSP on July 2, 2006, and that Warden Thompson took over on July 5, 2006, the day of Bradford's murder.  Thompson, therefore, had no opportunity to learn about or address the conditions that existed when Roberts left immediately before the murder." *Id.* at 761 n.9.

On remand, Bugge and Defendants reached a settlement agreement and this Court dismissed Bugge's claim with prejudice.  (Docs. 46, 47.)  On October 4, 2012, Defendants filed the instant Motion for Summary Judgment.  (Doc. 58.)  Plaintiff responded on November 19, 2012.  (Docs. 65, 66.)  Defendants filed their reply on December 20, 2012.  (Doc. 68.)  Having the benefit of full briefing on the instant matter, Defendants' Motion for Summary Judgment (Doc. 58) is ripe for review.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). A fact is "material" if it is a legal element of the claim under the applicable substantive law and it might affect the outcome of the nonmoving party's case. *Allen v.*

*Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999); *Celotex Corp.*, 477 U.S. at 323.

The movant bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must provide "enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Liberty Lobby*, 477 U.S. at 251). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex Corp.*, 477 U.S. at 322- 23; *Allen*, 121 F.3d at 646. "Inferences from the nonmoving

party's 'specific facts' as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are permissible under the governing substantive law." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). The Court must grant summary judgment if it finds there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## II. Court's Analysis

Defendants claim they are entitled to summary judgment for three reasons.  First, Defendants assert that Plaintiff's claims against Defendants Thompson and Cross are barred by *res judicata* because Plaintiff brought identical claims against those defendants in Georgia Superior Court and those claims were dismissed with prejudice. (Doc. 58-55 at 3.)   Second, Plaintiff failed to present sufficient evidence to survive summary judgment on his deliberate indifference claim as to both harms alleged; the harm stemming from "inadequate security measures" at CSP, and the harm stemming from the questioning that occurred on July 7 and 12, 2006.  (*Id.* at 7.)  Third, and in the alternative, Defendants argue that they are entitled to qualified immunity.  (*Id.* at 17.) In view of the following findings and rulings, the Court does not and need not address the *res judicata* defense.  The Court addresses the other two arguments in turn.

### A.  42 U.S.C. § 1983 & Deliberate Indifference

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.  Thus, "a plaintiff must establish that an act or omission

committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Chatham v. Adcock*, 334 F. App'x 281, 287 (11th Cir. 2009) (citation omitted). Further, a plaintiff must demonstrate "proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." *Murphy v. Turpin*, 159 F. App'x 945, 947 (11th Cir. 2005) (quoting *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* Thus, "deliberate indifference" is actionable under 42 U.S.C. § 1983.

To succeed on a deliberate indifference claim, Plaintiff must demonstrate that Defendants were "aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and [Defendants] must [have] also draw[n] that inference." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). "To survive summary judgment on such a § 1983 claim, a plaintiff must 'produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Bugge v. Roberts*, 430 F. App'x 753, 757 (11th Cir. 2011) (citing *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995)); *Staley v. Owens*, 367 F. App'x 102, 107 (11th Cir. 2010) (citing *Carter*, 352 F.3d at 1350)). Plaintiff argues that Defendants were deliberately indifferent to two substantial risks of serious harm: (1) the general risk of harm faced by the allegedly inadequate security measures taken at CSP, and (2) the individualized risk of harm faced after the Department of Corrections investigators questioned him on July 7 and 11, 2006. (Doc. 1 ¶¶ 12, 19.)

i.   <u>Substantial Risk of Harm</u>

As to the first element, which is the objective component of the claim, "an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm." *Purcell v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005).  Although "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment ... [a] prisoner has a right ... to be reasonably protected from constant threat of violence ... from his fellow inmates." *Id.* at 1320-21 (citing *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)).  The objective standard "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' but must be balanced against competing penological goals." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

Defendants argue that Plaintiff did not face any substantial risk of serious harm. (Doc. 58-55 at 7.)   Defendants assert that the general prison conditions did not pose such a risk because substantial changes took place at CSP following Bradford's murder on July 5, 2006.  (*Id.* at 8.)  Defendants also claim that the interviews that took place on July 7 and 12, 2006 did not pose such a risk of harm to Plaintiff because none of the Defendants had any involvement in calling Plaintiff to meet with the investigators, Plaintiff did not ask to be placed in protective custody, and the white inmate that was implicated in the tax fraud scheme that was being investigated on July 12 was not involved in the beating that occurred later that night.  (*Id.* at 8.)  Plaintiff argues that the general condition of CSP posed a substantial risk of harm to him because of the widespread violence at the prison and presence of weapons.  (Doc. 65 at 8-9.)  Plaintiff also argues that the interviews posed a substantial risk of harm because inmates had

witnessed circumstances that would permit them to infer he had been cooperating with investigators regarding criminal activity at CSP.  (*Id.* at 9.)

The Court finds that both substantial risks of harm identified by Plaintiff existed before he was attacked on July 12, 2006.  Based on the evidence before the Court, construed in a light most favorable to Plaintiff, the record supports a finding that, although efforts were being made by the Department of Corrections to remediate the dangerous nature of CSP, a reasonable jury could find that the condition of CSP posed a substantial risk to Plaintiff.  The only evidence Defendants have presented that suggests a reduction in the dangerousness of CSP is that 23 weapons were confiscated during the shakedown on July 6, 2006.  (Docs. 58-34 at 3; 66 at ¶ 54.)  This fact alone does not negate the Eleventh Circuit's findings regarding the dangerousness of CSP.

The Eleventh Circuit found that, prior to Bradford's murder, gang activity was rampant throughout the prison, weapons were widely available, and guards suggested to inmates that they should obtain weapons to protect themselves.  *Bugge*, 430 F. App'x at 759.  The evidence did not confine these conditions to Bradford's dormitory.  *Id.*  In fact, the evidence supported a finding that Plaintiff's dormitory, Dorm D-4, was more dangerous than Bradford's dormitory, Dorm J-2.  (Doc. 25-6 ¶ 9.)  A reasonable jury could find, based on the evidence before the Court, that the actions taken by the Department of Corrections in the days intervening Bradford's death on July 5 and Plaintiff's beating on July 12 did not operate in such a way to extinguish the substantial risk of harm posed by the dangerous condition of CSP.

Furthermore, the Court finds a substantial risk of harm was posed to Plaintiff by his participation in the investigations that took place on July 7 and 12, 2006.  At that time, Plaintiff was removed from his dormitory twice in the presence of all other

inmates for the purpose of speaking with investigators.   (Doc. 58-4 at 8 lns. 2-11.)
Plaintiff was one of the few inmates removed from his dormitory for this purpose.  (Doc.
25-6 ¶¶ 20-23.)   Clearly, the inmates were aware that the investigations were taking
place in light of a recent murder that occurred at CSP.  They were likely to infer that
investigators were seeking suspects who were involved in Bradford's murder.  In light of
the gang activity and violence at CSP, the Court finds that Plaintiff faced a substantial
risk of harm by being placed back in the normal population in his dormitory following
his interviews with investigators.

### ii.   Deliberate Indifference

The second element is a subjective standard with three components: "(1)
subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct
that is more than mere negligence." *Bugge*, 430 F. App'x at 757 (citing *McElligott v.
Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999)).   In other words, Defendants must have
"know[n] of and disregard[ed] an excessive risk to [Plaintiff's] health or safety."
*Farmer*, 511 U.S. at 837.  It is not necessary that Plaintiff demonstrate knowledge that it
was "likely [he was] to be assaulted by a specific prisoner who eventually committed the
assault." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007).
Defendants may escape liability if they show that "they did not know of the underlying
facts indicating a sufficiently substantial danger[,] or that they knew the underlying
facts but believed (albeit unsoundly) that the risk to which the facts gave rise was
insubstantial or nonexistent." *Farmer*, 511 U.S. at 844.

The requisite state of mind for deliberate indifference is something more than
negligence or carelessness. *See Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir. 2004).  As
such, "simple negligence is not actionable under § 1983, and a plaintiff must allege a

'conscious or callous indifference to a prisoner's rights.' " *Smith v. Reg'l Dir. of Fla. Dep't of Corr.*, 368 F. App'x 9, 14 (11th Cir. 2010) (quoting *Williams v. Bennett*, 689 F. App'x 1370, 1380 (11th Cir. 1982)).   "The known risk of injury must be a strong likelihood, rather than a mere possibility[,] before a guard's failure to act can constitute deliberate indifference." *Staley*, 367 F. App'x at 107 (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)) (alteration in original).

Plaintiff claims that Defendants were deliberately indifferent to the substantial risk of harm posed by (1) the general dangerousness of CSP, and (2) the individualized risk of harm posed by his participation in the investigations that took place on July 7 and 12, 2006.   As to the first risk of harm, the evidence demonstrates that the only defendants who had the power to change the dangerous condition of CSP were the former and current Wardens, Defendants Roberts and Thompson. *See Bugge*, 430 F. App'x at 760-61.   Accordingly, all other Defendants are entitled to summary judgment as to the first risk of harm. *See id.*

As to Defendant Thompson, Plaintiff's own deposition testimony illustrates that Defendant Thompson was taking steps to make the prison safer.   A shakedown was conducted on July 6, 2006; the prison was locked down from July 6 until July 12, 2006; criminal activity at the prison was being investigated; known gang members were being placed in segregation.   Unlike Defendant Roberts, there is no evidence that suggests any inmate notified Defendant Thompson of the dangerous condition of the prison.   (*See generally* Docs. 25-1, 25-4, 25-5, 25-6, 25-7.)   Because there is no evidence in the record to support a finding that Defendant Thompson was deliberately indifferent to the condition of CSP, he is entitled to summary judgment as to the first risk of harm.

16

As to Defendant Roberts, he would only be entitled to summary judgment on this element if circumstances took place between Bradford's murder and Plaintiff's beating in such a way that changed the basis of the Eleventh Circuit's finding that he was deliberately indifferent to the harm posed by the dangerous condition of CSP. As the Court pointed out on appeal, Defendant Roberts was the only defendant who was alleged to have had the power to take reasonable steps to address the dangerous condition of CSP. *Bugge*, 430 F. App'x at 760. Because the evidence suggested that "several inmates wrote to Roberts to inform him of the dangerous prison condition[,] Roberts failed to discipline inmates for possessing weapons or engaging in gang violence[, and] the pervasive and widespread nature of the conditions that the evidence shows existed suggest[ed] that Roberts 'had been exposed to information concerning the risk and thus must have known about it,' " a jury question existed as to whether Defendant Roberts was deliberately indifferent. *Id.* at 760-61 (citation omitted). There is no evidence in the record to suggest that circumstances changed such that Defendant Roberts was deliberately indifferent to the risk of harm posed to Bradford, but not deliberately indifferent to the risk of harm posed to Plaintiff. The evidence presents a jury question as to whether Defendant Roberts was deliberately indifferent to the harm posed by the dangerous condition of CSP. As such, Defendant Roberts is not entitled to summary judgment as to this element.

As to the second alleged risk of harm, Plaintiff has failed to demonstrate that any particular Defendant had subjective knowledge of the risk posed by his participation in the investigations. Plaintiff was unsure as to whether he informed any Defendants that he believed he was in danger. (*See* Doc. 58-4 at 11 lns. 11-13.) The only persons Plaintiff is certain he told that he believed he was in danger were investigators John Moore and

Bruce Oliver.  (Doc. 58-3 at 15 lns. 17-20; Doc. 58-4 at 4 lns. 15-17.)  Those individuals are not named in this suit.  As such, Plaintiff has failed to demonstrate that Defendants "actually possessed the requisite knowledge to be held liable."  *See Bugge*, 430 F. App'x at 758-59.  Therefore, all Defendants are entitled to summary judgment as to the second risk of harm.

                    iii.    <u>Causation</u>

To survive summary judgment, Plaintiff must raise a factual question as to whether Defendant Roberts' alleged deliberate indifference caused the harm actually suffered by Plaintiff.  *Hale*, 50 F.3d at 1582.  In other words, Plaintiff must have produced sufficient evidence to raise a jury question as to whether Defendant Roberts was deliberately indifference to the dangerous condition of CSP and, as a result, Plaintiff was beaten by other inmates.  *See id.*  As noted above, evidence exists in the record that suggests Defendant Roberts' had knowledge of the dangerous condition of CSP.  The record also supports a finding that, without Defendant Roberts' deliberate indifference to the dangerous condition of CSP, those responsible for Plaintiff's beating would not have had the opportunity to carry out the same.  Thus, a jury could find that Defendant Roberts' deliberate indifferent to the risk posed by the general condition of CSP caused the harm suffered by Plaintiff.  As such, Defendant Roberts is not entitled to summary judgment because "genuine issues of material fact exist as to the remaining element of [Plaintiff's] claims against Roberts—deliberate indifference and causation."  *See Bugge*, 430 F. App'x at 761.

**B. Qualified Immunity**

To defeat qualified immunity, Plaintiff must show that Defendant (1) violated a constitutional right (2) that was clearly established at the time of the alleged violation.

*Floyd v. Corder*, 426 F. App'x 790, 791-92 (11th Cir. 2011) (citing *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).  "A government officer defendant is entitled to qualified immunity unless, at the time of the incident, 'preexisting law dictates, that is, truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated [Plaintiff's] federal rights in the circumstances." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1030-31 (11th Cir. 2001) (citing *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994)).  A government officer is not entitled to qualified immunity where previous cases with "materially similar" facts establish that those specific circumstances violate federal law.  *Id.* at 1032.  On appeal, the Eleventh Circuit found that the condition of CSP, if proved, would have violated Bradford's constitutional rights based on the precedent set by *Marsh*, 268 F.3d 1014, *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995), and *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977).

In *Marsh v. Butler County*, the Eleventh Circuit held that similar prison conditions as those allegedly present at CSP violated a clearly established constitutional right.  *Marsh*, 268 F.3d at 1033 (citations omitted).  In *Marsh*, the plaintiff alleged that violent inmates were not segregated from the rest of the inmate population, the prison was routinely understaffed, homemade weapons were readily available, and prisoners were not adequately disciplined.  *Id.* at 1029.  *Williams* and *Hale* also involved dangerous prison conditions.  *See Hale*, 50 F.3d at 1581 (overcrowding and frequent inmate fighting); *Williams*, 547 F.2d at 1211 (270 stabbings with 20 resulting deaths in three years, numerous forcible rapes, overcrowding, understaffing of prison guards, and sanitation violations).  The Eleventh Circuit implicitly found that *Marsh*, *Williams*, and *Hale* are "materially similar" to the circumstances in this case, and " 'dictate[d]' ... the

conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated [Plaintiff's] federal rights in the circumstances." *See Marsh*, 268 F.3d at 1030-31.

The law of the case doctrine holds that "a decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (citation omitted).  For the doctrine to apply, the appellate court must have actually decided the issue.  *United States v. Saintil*, No. 13-11549, 2013 WL 4838821, *2 (11th Cir. Sept. 12, 2013) (citing *United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997)).  Under this doctrine, "[a]n appellate decision binds all subsequent proceedings in the same case not only as to explicit rulings, but also as to issues decided necessarily by implication on the prior appeal."  *United States v. Krocka*, No. 12-14435, 2013 WL 2631426, *3 (11th Cir. June 13, 2013) (citing *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996)).

Although the Eleventh Circuit did not explicitly hold that qualified immunity does not apply to Defendant Roberts, it noted that "based on *Marsh*, *Hale*, and *Williams*, the constitutional right at issue was clearly established at the time of the defendants' alleged misconduct."  *Bugge*, 430 F. App'x at 760 n.8.  The Court vacated summary judgment in favor of Defendant Roberts.  *Id.* at 761.  This holding necessarily implies that the Eleventh Circuit found that Defendant Roberts is not entitled to qualified immunity since a contrary finding would have entitled Defendant Roberts to summary judgment.  Because the same dangerous conditions that were prevalent at the prison in relation to Bradford's death could be deemed to have contributed to Plaintiff's beating, the Eleventh Circuit's implicit holding that Defendant Roberts is not entitled to qualified immunity is the law of the case.

Based on the foregoing, Defendants' Motion for Summary Judgment is **GRANTED** as to all Defendants except Defendant Roberts.  As to Defendant Roberts, Defendants' Motion for Summary Judgment is **DENIED.**

**SO ORDERED**, this  30th  day of September, 2013.

/s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,**
**UNITED STATES DISTRICT COURT**